Shaneeda Jaffer (CA 253449)
Carlo Lipson (CA 351153)
Benesch, Friedlander, Coplan & Aronoff LLP
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone:   628.600.2250
Facsimile:   628.221.5828
sjaffer@beneschlaw.com
clipson@beneschlaw.com

Attorneys for Plaintiff
WILTON RANCHERIA, CALIFORNIA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILTON RANCHERIA, CALIFORNIA,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>UNITE HERE,<br><br>　　　　　　　Defendant. | Case No. _____<br><br>**PLAINTIFF WILTON RANCHERIA, CALIFORNIA'S NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**(9 U.S.C. § 10(a)(4))** |

---

**PLAINTIFF WILTON RANCHERIA'S MOTION TO VACATE ARBITRATION AWARD**

**TO DEFENDANT AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on _____ at _____, or as soon thereafter as the matter may be heard, in a courtroom to be determined in the above-referenced Court, located at 501 I Street, Sacramento, CA 95814, Plaintiff Wilton Rancheria, California ("Plaintiff") will and hereby does move for this Court to: (a) vacate or modify Arbitrator Miller's June 17, 2025 Award; (b) grant the Tribe its reasonable costs in bringing this action; and (c) order any such additional relief that is necessary and proper.

This Motion is and will be based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and such oral argument as may be presented at the hearing on this Motion.

Dated: August 22, 2025                    Respectfully submitted,


                                          *s/ Shaneeda Jaffer*
                                          SHANEEDA JAFFER (CA 253449)
                                          CARLO LIPSON (CA 351153)
                                          Benesch, Friedlander, Coplan & Aronoff LLP
                                          100 Pine Street, Suite 3100
                                          San Francisco, California 94111
                                          Telephone: 628.600.2250
                                          Facsimile: 628.221.5828
                                          Email: sjaffer@beneschlaw.com
                                                 clipson@beneschlaw.com

                                          Attorneys for Plaintiff
                                          WILTON RANCHERIA, CALIFORNIA

---

1

**PLAINTIFF WILTON RANCHERIA'S MOTION TO VACATE ARBITRATION AWARD**

## I.   INTRODUCTION

1. Plaintiff Wilton Rancheria (the "Tribe"), by and through its undersigned counsel, hereby moves this Court for an order vacating or modifying the Arbitration Award and Opinion (the "Award") issued on June 17, 2024, by Arbitrator Anthony Miller. As discussed in detail below, Arbitrator Miller improperly adopted the decision, reasoning, and conclusion of Arbitrator Norman Brand from a previous arbitration involving the same parties. In doing so, Arbitrator Miller ruled that a private agreement (the "MOA") is controlling over a Tribal statute (the "TLRO") relating to labor relations and, in doing so, ignored the Tribe's sovereignty and statutory rights, and disregarded compelling public policy. Moreover, when Arbitrator Miller ruled the Tribe must comply with the union-related provisions in the MOA, rather than contrary provisions in the later-enacted TLRO, he ignored the explicit, overriding directive in the MOA through which the Tribe and the Union agreed "the Tribal Labor Relations Ordinance governs labor relations at the Casino." Accordingly, because Arbitrator Miller exceeded his powers and the Award cannot be corrected without affecting the merits of the decision, this Court should vacate or modify the Award.

## II.   JURISDICTION AND VENUE

2. This Motion seeks to have this Court vacate or modify an arbitration award pursuant to an arbitration agreement established by the August 2017 Memorandum of Agreement (the "MOA") between the Tribe, a sovereign tribe, and Respondent, a labor organization attempting to represent employees in an industry affecting commerce. As such, this Court has jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*, because the Tribe and the Union are parties to a contract requiring that disputes under the contract be decided by an Arbitrator, and the Tribe seeks to vacate or modify the Award issued pursuant to that contract.

3. The MOA provides that the United States District Court for the Eastern District of California shall have exclusive jurisdiction in any action concerning arbitration under the MOA. Accordingly, venue in this district is appropriate pursuant to the MOA.

## III.   PARTIES

4. The Tribe owns and operates a casino gaming facility, Sky River Casino (the "Casino"), located in Sacramento County, California, which is in the Eastern District of California.

5. Respondent UNITE HERE (the "Union") is a labor organization representing employees in industries affecting commerce, including in casinos, hotels, and food service operations. UNITE HERE conducts organizing and other union-related activities in the Eastern District of California.

## IV.   FACTS

6. The Tribe is a sovereign nation and a federally recognized Indian tribe with its own constitution, laws, and government located near Elk Grove, California. The Tribe operates the Casino pursuant to authorization from the United States Secretary of the Interior under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 (the "IGRA"). For a Tribe to operate "class III" (i.e., casino-style) gaming, the IGRA requires that the Tribe first negotiate a "Tribal-State compact" with the state in which the casino will be operated "governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3).

7. The Tribe and the State of California executed a Tribal-State Gaming Compact (the "Compact") in June 2017. The stated effective date of the Compact was January 22, 2018. As a prerequisite to engaging in casino gaming, the State negotiated with the Tribe to include in the Compact a template, and the Tribe agreed to enact a statute modeling the template Tribal Labor Relations Ordinance through its Tribal legislative process. Most notably, the template Tribal Labor Relations Ordinance contains the procedures to be used if a union indicates an interest in representing employees of a casino, including a process for a secret ballot election if the interested union is able to gather signed cards from at least 30% of the eligible employees. On April 18, 2019, the Tribe enacted the Tribal Labor Relations Ordinance of 2019 (the "TLRO") as Tribal legislation in a form virtually identical to the template required by the Compact.

8. As evidenced by references to the Compact and the TLRO in a Memorandum of Agreement (the "MOA") entered into in August 2017 among the Tribe, Boyd Gaming (as the Tribe's gaming management company), and the Union, the Union was aware of the TLRO. (Exhibit 1, MOA.) By this time, the Tribe had signed the Compact and was obtaining ratification of it. Pursuant to paragraph 14 of the MOA, "[t]he Union hereby agrees to actively support . . . the Tribe's efforts to obtain ratification of the Compact." In addition to paragraph 14, the MOA expressly indicates the parties' intention that the Union's employee organizing efforts would be governed by the provisions

of the TLRO. Paragraph 2 of the MOA provides: "[t]he parties agree that the Tribal Labor Relations Ordinance governs labor relations at the Casino, and to hereby establish the following procedure for the purpose of ensuring an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance to organize collectively[.]" *Id.*

9. However, the MOA also contains provisions that differ from TLRO. For example, under the MOA, if the Union provides a notice of intent to organize ("NOIO"), the Tribe was required to furnish the Union a list of employees within 15 days. *Id.* Conversely, Section 3-207(c) of the TLRO (appearing as Section 7(c) in the State's template) provides that the Tribe must provide the employee list within two days of receiving the Union's NOIO. (*See* Exhibit 2, TLRO.) More importantly, Section 3-210 of the TLRO (appearing as Section 10 in the template) provides that if the Union provides the Tribe with signed and dated authorization cards from 30% or more employees, there will be a secret ballot election held among eligible employees to determine if they wish to be represented by the Union, and if more than 50% of the employees vote for the Union, the Union would become the certified representative of the employees. On the contrary, paragraph 7 of the MOA purports to deprive employees of a secret ballot election and provides that the Union would be recognized as the exclusive collective bargaining representative of the employees if the Union presents signed authorization cards from a majority of the employees (this process is known colloquially as "card check"), without the benefit of a secret ballot election. In any event, because the MOA provides that the TLRO governs labor relations at the Casino, and the TLRO provides for a secret ballot election if a union presents to an arbitrator signed cards from at least 30% of the employees, the MOA therefore also requires a secret ballot election.

10. The Tribe enacted the TLRO on April 18, 2019, and the Casino opened in August 2022. On February 2, 2023, the Union presented the Tribe with a written NOIO, and the Tribe thereafter provided the Union with the employee list pursuant to the TLRO. On June 20, 2023, the Union informed the Tribe that it had collected signed authorization cards from a majority of the eligible employees, but instead of agreeing to hold a secret ballot election as required by the TLRO, the Union claimed that the Tribe had to recognize the Union as the exclusive bargaining representative of the eligible employees. The Tribe objected to the notion that a card check under the

MOA, which comprehended the later-enacted TLRO, could supersede the TLRO and responded that it would agree to hold an election under the procedures outlined in the TLRO. Eventually, the Tribe and the Union agreed to have an arbitrator decide whether the MOA or TLRO controlled the Union's organizing efforts.

11. The Tribe and the Union chose Arbitrator Norman Brand to determine this discrete issue. Arbitrator Brand recited the basis for the dispute between the Tribe and the Union in footnote 2 of his Award dated March 17, 2024, as follows:

> Pursuant to the Tribal-State Gaming Compact between the State of California and Wilton Rancheria, Wilton Rancheria was required to adopt and maintain Tribal Law identical to the Tribal Labor Relations Ordinance attached to the Compact. To comply with this requirement, Wilton Rancheria enacted the Tribal Labor Relations Ordinance of 2019 (TLRO), codified as Chapter 3 of the Wilton Rancheria Labor Code, on April 18, 2019. The TLRO provides for a two-step certification process before an arbitrator from the Tribal Labor Panel: (1) dated and signed authorization cards from thirty percent (30%) or more of the Eligible Employees; and (2) a secret ballot election requiring more than fifty percent (50%) of Eligible Employees. The TLRO requires all issues to be resolved by a resolution by the Tribal Labor Panel. [The Union] refuses to comply with the two-step certification process and the dispute resolution mechanism identified in the TLRO, relying on a Memorandum of Agreement (MOA) signed by the parties on August 7, 2017, prior to the enactment of the Tribe's TLRO. (*Se*e Exhibit 3, Brand Arbitration Award and Opinion, p. 2).

12. Arbitrator Brand framed the issue he was deciding as "[w]hether the Union must comply with the TLRO promulgated April 18, 2019, or the Tribe must comply with the MOA signed by the parties on August 7, 2017." *Id*. at p. 3.

13. In his Award, Arbitrator Brand decided the "Tribe must comply with the MOA signed by the parties on August 7, 2017." *Id*. at p. 16. Arbitrator Brand set forth three reasons for his finding: (1) the Tribe agreed to the MOA and, "[n]othing suggests the Tribe was unaware that it was agreeing to permit the Union to organize its employees and gain recognition through the card check process described in ¶ 7;" (2) the Tribe's contention that the purpose of the MOA was ". . . to memorialize the tribe's promise to maintain neutrality while allowing the union to organize in exchange for the union's support of ratification of the compact []" was unsupported; and (3) "the Tribe fails to show that the TLRO is a law it made as a sovereign that takes precedence over the MOA." *Id*. at p. 19. However, Arbitrator Brand's Award is not final and is not yet enforceable against the Tribe. See

*Unite Here Local 30 v. Wilton Rancheria,* No. 25-34, (9th Cir.2025) (DE # 13.1) (Tribe's Opening Brief in its Ninth Circuit Court of Appeals challenge of the District Court's Order denying the Tribe's Motion to Vacate the Award of Arbitrator Brand.).

14. Thereafter, the Tribe and the Union participated in a second arbitration on Friday, March 14, 2025. The narrow issue covered in the hearing before Arbitrator Anthony Miller related to Arbitrator Miller's decision to count the Union authorization cards at issue. In establishing the procedures and rules for reviewing the authorization cards presented by the Union, Arbitrator Miller, like Arbitrator Brand, relied on the MOA rather than the TLRO. Based on Arbitrator Miller's review of the authorization cards, Arbitrator Miller determined that the majority of employees in the bargaining unit "designated the Union as their exclusive collective bargaining representative", and that pursuant to the MOA, required the Employer to "recognize the Union as such representative of such employees" to engage in collective bargaining. (Exhibit 4, Arbitrator Miller's April 28, 2025 Award, p. 8).

15. In its Post Hearing Brief, the Tribe argued that the issues to be determined by Arbitrator Miller exceeded the narrow issue of reviewing and counting the cards collected by the Union. Rather, the Tribe argued that Arbitrator Miller was required to determine: (1) whether Arbitrator Miller had the authority to conduct the card check process outlined in the MOA while disregarding the TLRO's requirements to have a secret ballot election; (2) the extent to which the TLRO or the MOA governs or the proper order in which the TLRO and the MOA govern if both are appropriately considered; and (3) whether the authorization cards are still valid and, if they are only valid in part, what is the appropriate cutoff date. (Exhibit 5, Tribe's April 4, 2025 Post-Hearing Brief, p. 4.).

16. Before ruling on the issues identified by the Tribe, Arbitrator Miller invited the parties to submit Supplemental Post-Hearing Briefs. In its Supplemental Post-Hearing Brief, the Tribe raised its concern that Arbitrator Miller, like Arbitrator Brand, seemingly credited the MOA rather than the TLRO as controlling the election process. Again, the Tribe stressed the importance of Tribal sovereignty and challenged both Arbitrators' assumptions that a prior private agreement between the Tribe and the Union would prevail over a later-enacted Tribal law. Despite raising the issue on multiple occasions, in Arbitrator Miller's June 17, 2025, Award, Arbitrator Miller "adopted . . . the

5

Decision of Arbitrator Brand in this matter, his reasoning, and his conclusion that the Memorandum of Agreement applies to this dispute rather than the Tribal Labor Relations Ordinance." (Exhibit 6, Arbitrator Miller's June 17, 2025 Award, p. 11.).

17. In deciding that the Tribe must comply with the MOA, Arbitrator Miller improperly failed to recognize that he was giving precedence to an agreement (that itself incorporated the contemplated TLRO election process) over a legislative enactment of a sovereign nation. The Award therefore should be vacated or corrected.

## V.  FIRST CLAIM: AWARD EXCEEDED ARBITRATOR'S AUTHORITY BECAUSE THE ARBITRATOR ENGAGED IN A MANIFEST DISREGARD OF TRIBAL SOVEREIGNTY

18. The Tribe incorporates by reference paragraphs 1 through 17 as if set out in full.

19. Because Arbitrator Miller's Award adopted Arbitrator Brand's Award, which also disregarded the Tribe's sovereignty, Arbitrator Miller's Award must be vacated or modified.

20. Under Section 10 of the FAA, a court may vacate an Arbitrator's Award "where the arbitrators exceed their powers, or so imperfectly executed them that a mutual, final, and definitive award upon the subject matter submitted was not made." 9 U.S.C.A. § 10(a)(4).

21. In making his Award, Arbitrator Miller exceeded his power by exhibiting a manifest disregard of both federal and Tribal law and by basing the Award on Arbitrator Brand's unenforceable award and his own irrational reading of the MOA.

22. Under Federal law, as sovereign entities, tribes have full authority to regulate and oversee tribal activities. *See United States v. Wheeler,* 435 U.S. 313, 322 (1978). Their status as sovereign nations afford the federal government limited say over tribal affairs, and not even the Constitution "dictate[s] the metes and bounds of tribal autonomy." *United States v. Lara*, 541 U.S. 193, 205 (2004). Rather, only legislation from Congress, and not the states, can regulate tribes, but until Congress acts, "tribes retain their historic sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014).

23. By adopting Arbitrator Brand's decision, reasoning, and conclusion, Arbitrator Miller necessarily found that "the Tribe ceded its power to regulate labor relations in the State," so that

"passing the TLRO was not a sovereign act," because by agreeing "to give up its sovereign power [to] legislate labor relations in return for a compact that permitted it to engage in Class III gaming in its casino" the Tribe "ceded its sovereign right to control labor relations in the casino." (Exhibit 3).

24. However, as a sovereign, the Tribe could enter into a compact with California and retain sovereign power to pass legislation and regulate its own affairs. These compacts are a consequence of the exercise of sovereign power rather than a method of abandoning it. By adopting Arbitrator Brand's reasoning and conclusion, which is being reviewed by the Ninth Circuit, Arbitrator Miller's disregard of this fundamental legal principle contaminated his entire award and led him astray in erroneously ruling that the Tribe had no sovereign power to regulate labor relations. By pushing the Tribe's sovereignty aside, Arbitrator Miller failed to apply well-established law and thus exceeded his powers.

## VI. SECOND CLAIM: AWARD EXCEEDED ARBITRATOR'S AUTHORITY BECAUSE THE ARBITRATOR ENGAGED IN A MANIFEST DISREGARD OF THE TLRO

25. The Tribe incorporates by reference paragraphs 1 through 24 as if set out in full herein.

26. Because Arbitrator Miller's Award subordinated the lawfully passed TLRO to a prior contract entered into by private parties, Arbitrator Miller's Award finding that the MOA rather than the TLRO controlled resulted in a manifest disregard of the TLRO and should be vacated or modified.

27. With sovereignty comes a corollary right to pass binding laws. A "law is defined by the sovereign that makes it, expressing the interest that the sovereign wishes to vindicate." *Denezpi v. United States,* 596 U.S. 591, 597 (2022).

28. Just like state and federal statutes, Tribal ordinances are law. Accordingly, ordinances—such as the TLRO—carry the force of law, govern legal disputes, and cannot be ignored.

29. In passing the TLRO, the Tribe exercised its sovereign authority to enact Tribal law. Tribal Council Resolution No. 2019-23 (attached to the adopted TLRO) (the "Resolution") sets forth the Tribe's authority to adopt the TLRO. The Resolution first notes that the Tribe's Constitution grants its Tribal Council the power to make "all laws, including resolutions, codes and statutes," and pass laws regulating the Tribe's "elections, enrollment, and employment, and all other matters so

long as those laws are consistent with [the Tribe's] Constitution." *Id.* The Resolution also summarizes the process through which proposed acts become "the formal laws based by the Tribal Council in development of the Tribe's permanent body of law," according to the Tribal Council Organization Act of 2012. *Id.* (citing WRC § 1-303(A).)

30.   First, all acts and amendments must pass through a legislative process including an internal review phase, a public review phase, and a final review phase. Second, during the 30-day public review phase, the Tribal Council must solicit comments from members of the public regarding the proposed act and must hold at least one public hearing. *Id.* Third, the proposed act must be submitted to each member of the Tribal Council for a final review period of no less than seven days. *Id.* Tribal Council Resolution No. 2019-23 confirmed the TLRO proceeded through all three steps.

31.   "[A] contract entered into by a private party with the government will not be interpreted to exempt the private party from the operation of a subsequent sovereign act by the government." *Centex Corp. v. United States,* 395 F.3d 1283, 1306-07 (Fed. Cir. 2005). Government contracts must be construed "to avoid foreclosing exercise of sovereign authority." *Peterson v. U.S. Dep't of Interior,* 899 F.2d 799, 807 (9th Cir. 1990). In short, "[s]overeign power governs all contracts subject to the sovereign jurisdiction." *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996) (citations and quotations omitted).

32.   Similarly, Tribal courts have determined that tribal law supersedes conflicting private agreements which seek to displace sovereign jurisdiction. *Neptune Leasing, Inc. v. Mountain States Petroleum Corp.*, No. SC-CV-24-10, 2013 WL 2393054, at *168 (Navajo May 13, 2013) (refusing to enforce clause in private security agreement purporting to give exclusive jurisdiction to Texas courts because "no private agreement can ever avoid Navajo Nation jurisdiction over transactions on Navajo trust land.").

33.   Arbitrator Miller recognized the existence of the TLRO and its status as an ordinance, but then disregarded it because, in his view, a private contract—the MOA—overrode the ordinance. By subordinating the TLRO to the MOA, Arbitrator Miller disregarded the importance of the TLRO's passage as an act of tribal sovereignty, but also subordinated the TLRO to the MOA, resulting in an impermissible circumvention of the Tribe's sovereign powers.

34. First, because the TLRO was lawfully passed pursuant to the sovereign power of the Tribe, the TLRO rather than the MOA controls. Second, the MOA acknowledges the supremacy of the TLRO by specifically acknowledging that the Union's employee organizing efforts would be governed by the provisions of the TLRO. Thus, the TLRO must be read to supersede the MOA to the extent that a conflict exists. Finally, because private agreements may not operate in a way to displace Tribal sovereignty, the TLRO must be read to control Tribal labor relations. Therefore, because the MOA itself acknowledges the superiority of the TLRO, any reading of the MOA and the TLRO together that does not compel the conclusion that the TLRO—rather than the MOA—governs, results in a manifest disregard of the TLRO.

35. By adopting Arbitrator Brand's flawed reasoning and conclusion—currently under review by the Ninth Circuit[1]—Arbitrator Miller's subverted the fundamental legal principle that laws passed by a sovereign govern contracts subject to sovereign jurisdiction. His adoption of the inverse principle—that contracts between private persons take precedence over the laws of the sovereign—exceeded his power and his Award finding that the MOA, rather than the TLRO, controls should be vacated or corrected.

## VII. THIRD CLAIM: AWARD DID NOT DRAW ITS ESSENCE FROM THE MOA

36. The Tribe incorporates by reference paragraphs 1 through 35 as if set out in full herein.

37. This Court may vacate Arbitrator Miller's Award if it finds that the Award is "completely irrational" or exhibits a "manifest disregard of law." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.,* 341 F.3d 987, 997 (9th Cir. 2003) (en banc) (first quoting *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986), then quoting *Todd Shipyards Corp. v. Cunard Line, Ltd.,* 943 F.2d 1056, 1059–60 (9th Cir. 1991)).

38. An award is "completely irrational" if the arbitrator's decision "fails to draw its essence from the agreement." *Comedy Club, Inc. v. Improv W. Assocs.,* 553 F.3d 1277, 1288 (9th Cir. 2009) (quoting *Hoffman v. Cargill Inc.,* 236 F.3d 458, 461–62 (8th Cir. 2001)). Whether an

---

[1] In the U.S. Court of Appeals for the Ninth Circuit, docket number 25-234, the Opening Brief was submitted on April 25, 2025, the Answering Brief was submitted on May 23, 2025, and the Reply Brief was submitted on July 14, 2025. Oral arguments are set to occur between November 17-21, 2025.

award "draws its essence from the agreement" is viewed in light of the agreement's language and context, as well as other indications of the parties' intentions. *See Bosack v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009) (quoting *Lincoln Nat'l Life Ins. Co. v. Payne*, 374 F.3d 672, 675 (8th Cir. 2004)); *see also Coast Trading Co., v. Pac. Molasses Co.*, 681 F.2d 1195, 1197 (9th Cir. 1982) (holding that an "arbitrator is confined to the interpretation and application of the parties' agreement" and that an "award is legitimate only so long as it draws its essence from the . . . agreement" (internal quotations omitted)).

39. In relying on the MOA, the Arbitrator ultimately failed to draw on its "essence" by disregarding critical language and refusing to apply the superseding TLRO as follows:

40. Neither Arbitrator Brand nor Arbitrator Miller addressed the MOA's explicit incorporation of the Compact's model Tribal Labor Relations Ordinance, which later became the TLRO. Both Arbitrators also discounted paragraph 2 of the MOA, that "[t]he parties agree that the Tribal Labor Relations Ordinance governs labor relations at the Casino." In cases where an arbitrator disregards "specific provisions" of a contract, the arbitration award is completely irrational and subject to vacatur. *See Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors, LLC,* 913 F.3d 1162, 1168 (9th Cir. 2019) ("the Arbitrator exceeded his authority and . . . [t]he Award disregarded specific provisions of the plain text in an effort to prevent what the Arbitrator deemed an unfair result. Such an award is 'irrational.'").

41. Thus, Arbitrator Miller, by adopting Arbitrator Brand's Award, rendered a completely irrational Award by not only entirely disregarding explicit language within the MOA, but also negating the MOA's stated purpose—to aid the Tribe in its gaming license ratification efforts. For this separate reason, the Award should be vacated or corrected.

## VIII.  DEMAND FOR RELIEF

42. For the reasons set forth above, the Tribe respectfully requests that this Court: (a) vacate or modify Arbitrator Miller's June 17, 2025 Award; (b) grant the Tribe its reasonable costs in bringing this action; and (c) order any such additional relief that is necessary and proper.

///

///

///

Dated: August 22, 2025                                  Respectfully submitted,

*s/ Shaneeda Jaffer*
SHANEEDA JAFFER (CA 253449)
CARLO LIPSON (CA 351153)
Benesch, Friedlander, Coplan & Aronoff LLP
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone: 628.600.2250
Facsimile: 628.221.5828
Email: sjaffer@beneschlaw.com
            clipson@beneschlaw.com

Attorneys for Plaintiff
WILTON RANCHERIA, CALIFORNIA

**PLAINTIFF WILTON RANCHERIA'S MOTION TO VACATE ARBITRATION AWARD**